UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

04 MAR 25  FII 3: 08

U.S.
N D OF ALABAMA

| | | |
|---|---|---|
| MEDHI OLFATI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 02-B-1283-S |
| | ) | |
| EPOS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED

MAR 25 2004

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary
Judgment. (Doc. 14.) Plaintiff Medhi Olfati has sued his former employer, defendant EPOS
Corporation, alleging that defendant discriminated against him on the basis of his national
origin, which is Iranian. Upon consideration of the record, the submission of the parties, the
arguments of counsel, and the relevant law, the court is of the opinion that defendant's
Motion for Summary Judgment, (doc. 14), will be granted.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record
shows "that there is no genuine issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the
initial burden of showing no genuine issue of material fact and that it is entitled to judgment
as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).
Once the moving party has met this burden, Rule 56(e) requires the non-moving party to go

beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every *plausible* inference. *See Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. STATEMENT OF FACTS

Plaintiff Medhi Olfati is of Iranian descent. (Doc. 1 ¶ 2.) He worked for defendant EPOS Corporation from 1987 until defendant terminated him on August 24, 2001. (Doc. 22, Ex. A ¶ 3 and ¶ 10.)

Defendant provides interactive voice response technology to universities, governments, utilities, and other businesses. (*Id.* ¶ 2.) Until 1998, defendant had two primary divisions – the Plastics Monitoring Division and the Interactive Voice Response Systems ["IVRS"] Division. (*Id.*) Defendant sold its Plastics Monitoring Division in 1998. (*Id.*)

2

Plaintiff had worked in the Plastics Monitoring Division until it was sold. (Doc. 22, Ex. B at 32-36; Ex. C ¶ 3.) In that Division, he managed three employees. (Doc. 22, Ex. B at 102; Ex. C ¶ 3.) After the sale of the Division, plaintiff transferred to the IVRS Division. (Doc. 22, Ex. C ¶ 4.)

Plaintiff worked as Information Systems Manager for approximately six months in the IVRS Division. (Doc. 22, Ex. A ¶ 4; Ex. C ¶ 6.) Thereafter, plaintiff was appointed Director of Development Services. (Doc. 22, Ex. A ¶ 5; Ex. C ¶ 6.)

In that position, plaintiff managed employees who developed software applications after sales. (Doc. 22, Ex. A ¶ 5.) Defendant contends that plaintiff had significant problems managing the multiple projects and large staff in his new position. (Doc. 22, Ex. A ¶ 5; Ex. C ¶ 7.) Defendant received complaints about plaintiff from other employees and from customers. (Doc. 22, Ex. A ¶ 5.)

On May 1, 2001, defendant hired Anne Welch, who is a Caucasian female. (*Id.* ¶ 6; Ex. C ¶ 7.) Welch had extensive experience and established skills in development services. (Doc. 22, Ex. A ¶ 6.) Plaintiff was transferred to the position of Director of Application Service Provider Operations ["ASP"], which was a newly created position in a new division. (Doc. 22, Ex. A ¶ 7.) Plaintiff considered the transfer a demotion. (Doc. 17, Ex. 1 at 129.)

Plaintiff's salary was reduced when he transferred because the new division was not financially self-supporting. (Doc. 22, Ex. C ¶ 8.) Plaintiff's salary while Director of Development Services was $90,000 a year, with the potential for quarterly bonuses of $2,500 based on achievement of revenue targets. (*Id.*) Plaintiff's salary as Director of ASP was

$81,000 a year, with a potential bonus of $3,000 on August 31, 2001, potential quarterly performance bonuses of $2,500 to $3,500, and a scheduled salary increase to $85,000 by September 2001. (*Id.*) Defendant contends that for the period from May 2001 thru August 2001, plaintiff would have earned the same compensation if bonuses are included, $30,000. (*Id.*) However, the court's calculations indicate that from May 2001 thru August 2001, plaintiff actually earned $1750 less than if he would have earned as Director of Development Services.[1]

Defendant became disappointed with plaintiff's job performance as Director of ASP by the beginning of August 2001. (Doc. 22, Ex. A ¶ 8.)  Ben Mitchell, Vice President of Engineering and Services, expressed his disapproval of plaintiff's performance in an e-mail, which stated:

> This is a note to let you know where I think things stand with the ASP and your performance over the last few months. I thought I would send this to you in writing since you mentioned that you have not been getting any written feed back from me on a regular basis.
>
> When I initially discussed this position with you I indicated that you would have to rely on your knowledge and resourcefulness to get this job done. Since this is a new division you would need to take responsibility for all aspects of the development and be willing to do a lot of the development your self. As I expected you have, with the exception of the ISA server, configured and administered the ASP hardware on your own. I was not surprised, nor was it unexpected, that you would need assistance in setting up the IVR. However, I was disappointed in how much of David's time you ended up needing to get

---

[1]Defendant contends that as Director of Development Services plaintiff would have earned $90,000 per year with a possible bonus of $2,500 per quarter; therefore, plaintiff's quarterly gross income as Director of Development Services, including a bonus, was **$25,000** ($90,000 ÷ 4 + $2,500 = $25,000). However, as ASP Director plaintiff would have earned $81,000 per year with a possible bonus of $3,000 per quarter; therefore, plaintiff's quarterly gross income as ASP Director, including a bonus, was **$23,250** ($81,000 ÷ 4 + $3,000 = $23,250).

the database design done.  I felt with your background from the plastics work that you would need only moderate direction from Fred and David on the database design and creation.  As it turned out, David did the design and you implemented the tables in the SQL server.  Also, I expected you to be able to apply your knowledge of reports to design and to aggressively generate the reports that Michael, Mike and the customers need.  Many discussions during the initial design stages of this project were held regarding the needed reports. At this point only one report has been completed and it is taking weeks rather than days or hours to generate the new ones.  I'm also disappointed in the fact you have not produced adequate documentation for support or for continued development of new applications.  You have been assigned one of the best developers for the initial setup in Emily and yet I still have not seen the first document, nor is support satisfied with the training and information they have received.  Another initial goal you and I discussed was your working with Don and Cathy to identify and develop demos that would help sell and promote the ASP product line.  As of yet no discussions with Don and Cathy have been held and other than some minimal conversations regarding the power outage application nothing new is being worked on.

. . .

. . . [T]he purpose of this email is for you to know where I see your weaknesses are and to realign the two of us so that we are working towards the same goals.  I feel you have let your primary goals slip and have moved to other work instead of tying up these loose, but very important, ends.

(Doc. 17, Ex. 2.)

Plaintiff objected to this criticism of his job performance, and he responded to Mitchell's e-mail stating, ". . . I do believe I have done a very good job with everyone of us going through steep learning curves while putting this project together." (Doc. 17, Ex. 3.) He also stated, "Some encouragement would have been appreciated instead of ONLY negative statements.  I do not believe you are fully aware of how complex and detailed this

project has been," and, ". . . I would like to express my [outrage] of your email that everything is done wrong and frankly I am hurt by that." (*Id.*)

Defendant experienced an economic downturn in August 2001. (Doc. 22, Ex. C ¶ 9.) Defendant reduced its work force by 18 employees. (*Id.*)  Plaintiff was included in this reduction-in-force ["RIF"], and defendant discharged him effective August 24, 2001. (Doc. 22, Ex. A ¶ 10-11.)  Plaintiff was the only upper-level employee whose country of national origin was not the United States of America and he was the only upper-level employee to be discharged during the RIF. (Doc. 17, Ex. 6 ¶¶ 7-8.)  Plaintiff's position was eliminated and the duties of his position were merged with the duties of his former position, Director of Development Services. (Doc. 22, Ex. A ¶ 9.)  Welch continued to perform as Director of Development Service, and assumed plaintiff's job duties. (*Id.*)

Plaintiff testified that ". . . it was a joke around in the company about being . . . [an] Iranian terrorist." (Doc. 23, Ex. A at 52.)  He testified that several co-employees made the comments or laughed about it. (*Id.*)  Plaintiff was offended by the comments, but he did not ". . . explicitly tell [his supervisor] that [the co-employees had] made jokes about [his] nationality." (*Id.* at 52, 54.)  He told Mitchell that there had been comments made during a "professional meeting" that were "not professional." (*Id.* at 54.)

## III. DISCUSSION

### A. SECTION 1983 AND THE EQUAL PROTECTION CLAUSE

Plaintiff's Complaint alleges that he was discriminated against on the basis of his national origin in violation of Section 1983 and the Equal Protection Clause. (Doc. 1 at 1,

4.) Plaintiff may not invoke the Equal Protection Clause or Section 1983 as a source for defendant's liability based on employment discrimination because defendant is a private entity and the Equal Protection Clause reaches only state actors and state action. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) ("To state a claim for relief in an action brought under § 1983, respondents must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law. Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful.")(citations and internal quotations omitted).

The court finds nothing in the record to indicate any state action. Defendant did not seek summary judgment on this claim based on the lack of state action. However, because the law is well-established that plaintiff cannot possibly establish a § 1983/Equal Protection Claim against defendant, the court will dismiss such claim *sua sponte*.

## B. SECTION 1981 AND TITLE VII

Plaintiff contends that defendant discriminated against him by taking two adverse job actions on the basis of his national origin – (1) the demotion from Director of Developmental Services to Director of ASP Operations; and (2) the termination.

### 1. Transfer

#### a. Prima Facie Case

Generally, to demonstrate a prima facie case of discrimination with regard to termination, plaintiff must show: (1) he is a member of a protected class; (2) he was subjected to adverse employment action; and (3) his employer treated a similarly situated employee outside the protected class more favorably. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). Defendant contends that plaintiff cannot establish a prima facie case because he cannot establish that his "transfer" constituted an "adverse" employment action and because plaintiff was replaced by a woman, "who was in her own protected class based on her gender."

The Eleventh Circuit has held that a plaintiff is required to establish that he suffered an "adverse employment action" as a part of his prima facie case. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001). "[T]o support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of [employment] in a real and demonstrable way." *Id.* at 1239.

> . . . [T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a ***serious and material*** change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Id.* (emphasis in original).

Plaintiff contends that the transfer to the position of Director of APO was a demotion. (Doc. 17, Pl. Br. in Opp. to Mot. for Summ. J. at 5.)  The court notes that defendant actually paid plaintiff less after the transfer.  The court finds the reduction in pay alone is sufficient to allow a reasonable jury to find that the transfer was an adverse employment action. *Hinson v. Clinch County, Georgia Bd. of Educ*, 231 F.3d 821, 829 (11th Cir. 2000)(". . . [A] transfer to a different position can be 'adverse' if it involves a reduction in pay . . . ." (citing *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448 (11th Cir.1998)).

Defendant also contends that plaintiff cannot establish a prima facie case of employment discrimination with regard to his transfer because he was "replaced by Anne Welch, a Caucasian American, who was in her own protected class based upon her gender." (Doc. 22 at 8.)  However, the fact that plaintiff's replacement belongs to "*her own*" protected class, but not *plaintiff's* protected class, is immaterial to the court's determination of whether plaintiff has established a prima facie case of unlawful employment discrimination based on *his* protected class. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1186 (11th Cir. 1984)("When an individual proves that he was fired but one outside *his* class was retained although both violated the same work rule, this raises an inference that the rule was discriminatorily applied against that individual . . . ." (emphasis added)).

Plaintiff contends that he was transferred because of his national origin, which is Iranian, and that Welch, an American, replaced him.  This is sufficient to establish a prima facie case of national origin discrimination.  Other protected characteristics – such as color, gender, religion, and age – are simply not at issue.

For the reasons set forth above, the court finds that plaintiff has established a prima facie case of national origin discrimination with regard to his transfer from Director of Developmental Services to Director of ASP Operations.

### b.  Articulated Non-Discriminatory Reason

Defendant contends that it transferred plaintiff because plaintiff "had problems managing multiple projects and the large staff [of Development Services], and [defendant] received several complaints about [plaintiff] from this Division's customers and employees." (Doc. 22, Ex. A ¶ 5.)  These reasons are sufficiently clear and reasonably specific  to shift the burden to plaintiff to establish that the reasons are a pretext for national origin discrimination. *See generally Chapman v. AI Transport*, 229 F.3d 1012, 1035-36 (11th Cir. 2000); *Increase Minority Participation by Affirmative Change Today of Northwest Florida, Inc. (IMPACT) v. Firestone*, 893 F.2d 1189, 1193-94 (11th Cir. 1990), *cert. denied* 498 U.S. 847 (1990).

### c.  Pretext

Because defendant has articulated a legitimate nondiscriminatory reason for plaintiff's termination –

> the presumption of discrimination is eliminated and "the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.

*Chapman*, 229 F.3d at 1024-25 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528-29 (11th Cir. 1997), *cert. denied sub. nom. Combs v. Meadowcraft Co.*, 522 U.S. 1045 (1998))(internal citations and quotations omitted).

Plaintiff may establish that an articulated reason is a pretext for discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989)(quoting *Goldstein v. Manhattan Industries*, 758 F.2d 1435, 1445 (11th Cir. 1985)(citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)), *cert. denied* 474 U.S. 1005 (1985)). If plaintiff chooses to establish pretext by showing that his employer's proffered reason is unworthy of credence, he must attack that reason "head on and rebut it." *Chapman*, 229 F.3d at 1030. He must offer evidence that "cast[s] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Ry. Co.* , 37 F.3d 603, 605 (11th Cir. 1994)).

Plaintiff contends that defendant's reasons for demoting him are a pretext for discrimination because defendant has not produced "copies of any complaints or anything else . . . to support the fact that any complaints were in fact made about the Plaintiff," and because "[e]ach and every company evaluation of the Plaintiff was excellent." (Doc. 17, Pl. Br. in Opp. to Mot. for Summ. J. at 5-6.) However, the *mere* fact that defendant did not

11

"produce" documented complaints from employees or customers and/or documents relating to plaintiff's performance problems is not significantly probative of whether its articulated reasons for transferring him are unworthy of credence.[2]  Plaintiff has not directed the court to any evidence that he did not have performance problems or that employees and customers did not complain about him.  Moreover, he has cited no record evidence from which the court can infer that the decision maker did not consider these two things – plaintiff's performance and complaints from employees and customers – in deciding to transfer plaintiff.

Based on the foregoing, the court finds that plaintiff has not established that defendant's articulated reasons for his transfer are unworthy of credence.  Therefore, defendant's motion for summary judgment will be granted, and plaintiff's claim based on his transfer will be dismissed.

## 2. Termination

Defendant contends that plaintiff was terminated when his position was eliminated pursuant to a RIF.  Because employees are often not "replaced" in a RIF, the prima facie case requirements have been refined to require a plaintiff to show he "was qualified to assume another position at the time of his discharge or demotion" and "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to

---

[2]The court notes that the declarations of Michael A. Lawler, President of EPOS, and Edward R. Graf, Assistant to the President of EPOS, state that defendant "received several complaints about [plaintiff] from [the] Division's customers and employees." (Doc. 22, Ex. A ¶ 5; Ex. C ¶ 7.)  Plaintiff has not come forward with any evidence to dispute this testimony.

discriminate in reaching the decision at issue." *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1438 (11th Cir. 1983).

The undisputed evidence shows that plaintiff's job duties were assumed by Welch, the American employee who had replaced him as Director of Developmental Services. The evidence supports a finding that defendant retained, or preferred, Welch during the RIF despite plaintiff's apparent qualifications to perform the job duties of the new position. [3] Therefore, the court finds that this evidence is sufficient to establish a prima facie case of national origin discrimination with regard to plaintiff's termination.

### b. Legitimate Nondiscriminatory Reason

Defendant contends that it terminated plaintiff as part of a RIF occasioned by economic factors and that plaintiff was not qualified to assume the position of Director of Development Services as it existed after the RIF. It also contends that plaintiff's position was the only management position that could have been eliminated without an adverse impact on defendant. These reasons are sufficiently clear and reasonably specific to shift the burden to plaintiff to establish that the reasons are unworthy of credence. *See Chapman*; 229 F.3d at 1035-36; *IMPACT*, 893 F.2d at 1193-94.

---

[3] The court notes that the Eleventh Circuit has long recognized that in cases where an employee claims that, because of unlawful discrimination, his employer removed him from a position he has held for a "significant period of time," it generally may be inferred that he was "qualified" to hold the position for purposes of a prima facie case and that any job performance problems asserted by the employer as the basis for the employee's alleged lack of qualifications may be appropriately addressed at the second and third stages of the *McDonnell Douglas* framework. *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999); *Young v. General Foods Corp.*, 840 F.2d 825, 830 n.3 (11th Cir. 1988); *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987); *Pace v. Southern Ry. System*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983).

### c. Pretext

Plaintiff contends that defendant's reasons for deciding to terminate him during the RIF are unworthy of credence because he should have returned to his old position and he had reported discriminatory comments made to him by employees and customers to "management."

Plaintiff has presented no evidence to rebut defendant's articulated reason that his position was eliminated due to a RIF and that he was not qualified to assume the position of Director of Development Services as it existed after the RIF. His argument that defendant should have retained him is simply not supported by any evidence in the record that rebuts defendant's reasons "head-on."

Plaintiff also argues that alleged discriminatory comments are sufficient to show bias. However, plaintiff testified that he did not tell management the comments had referred to his national origin and nothing in the record indicates that the decisionmakers adopted or ratified the discriminatory nature of the comments. Therefore, plaintiff has not demonstrated sufficient evidence from which the court may infer a discriminatory bias in the decisionmaking process.

Because plaintiff has not established pretext or a discriminatory bias on the part of the decisionmakers, the court finds that defendant's Motion for Summary Judgment will be granted and plaintiff's termination claim will be dismissed.

14

## IV. CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An order granting defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.

DONE this _25th_ day of March, 2004.

SHARON LOVELACE BLACKBURN
United States District Judge

15